1UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

**1:05-CR-501**
**(FJS)**

KEON RICHMOND,

**Defendant.**

---

APPEARANCES

OF COUNSEL

**OFFICE OF THE UNITED
STATES ATTORNEY**
James T. Foley U.S. Courthouse
Room 218
445 Broadway
Albany, New York 12207-2924
Attorneys for the United States

EDWARD P. GROGAN, AUSA

**OFFICE OF THE FEDERAL
PUBLIC DEFENDER**
39 North Pearl Street, 5th Floor
Albany, New York 12207
Attorneys for Defendant

PAUL J. EVANGELISTA, AFPD

**SCULLIN, Senior Judge**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

Defendant is charged in a two-count Indictment dated October 7, 2005. Count 1 alleges that "[o]n or about May 27, 2005, in Ulster County, . . . KEON RICHMOND, the defendant herein and an alien, did knowingly, willfully and falsely represent himself to be a citizen of the United States, to a United States Immigration Inspector . . . [i]n violation of Title 18, United States Code, Section 911." *See* Indictment at Count 1. Count 2 alleges that "[o]n or about June

1, 2005, in Ulster County, . . . KEON RICHMOND, the defendant herein and an alien, did

knowingly, willfully and falsely represent himself to be a citizen of the United States, to a United

States Immigration Inspector . . . [i]n violation of Title 18, United States Code, Section 911."

*See* Indictment at Count 2.

Currently before the Court is Defendant's motion to suppress the statements that he made

to immigration officers on May 27, 2005, and June 1, 2005.[1]  Although the Government opposed

this motion, it consented to a suppression hearing.  *See* Dkt. No. 12.  On March 21, 2006, the

Court held a suppression hearing and reserved decision at that time.  The following constitutes

the Court's written decision regarding the pending motion.


## II. BACKGROUND

At the time that the immigration officers interviewed him on May 27, 2005, and June 1,

2005, Defendant was incarcerated in the Ulster County Correctional Facility on an unrelated state

sentence.  Department of Homeland Security Deportation Officer Peter Mortensen interviewed

Defendant on May 27, 2005, at the Ulster County Correctional Facility; and Immigration and

Customs Enforcement ("ICE") Senior Special Agent Michael Polouski, together with

Immigration Agent Spiros Karabinas, interviewed Defendant on June 1, 2005, at the same

facility.  Based upon the information that they obtained during those interviews concerning

Defendant's place of birth, the Government charged him with false claims of United States

---

[1] In his motion, Defendant also sought suppression of the statements that he made to immigration officers on December 15, 2005.  However, at the suppression hearing, the Government informed the Court that it did not intend to use these statements as evidence in its case-in-chief.  *See* Dkt. No. 18, Transcript of Suppression Hearing, at 4.

citizenship.

Defendant moves to suppress the statements that he gave to the immigration officers for several reasons.  Specifically, he moves to suppress the May 27, 2005 statements on the grounds (1) that he was not provided with his *Miranda* warnings; (2) that, even if he were given his *Miranda* warnings, he did not voluntary waive his Fifth Amendment rights; and (3) that his statements were not voluntary.

Furthermore, with regard to his June 1, 2005 statements, Defendant moves for suppression on the grounds (1) that he was not given proper *Miranda* warnings, (2) that he never made a voluntary waiver of his Fifth Amendment rights as *Miranda* requires, (3) that he exercised his rights, (4) that his statements were not voluntary, and (5) that his statements were tainted by his unmirandized, coerced May 27, 2005 statements.

In response to Defendant's motion, the Government asserts (1) that the Fifth Amendment does not provide an individual with the right to lie; (2) that, because Defendant's May 27, 2005 and June 1, 2005 interviews were immigration interviews, *Miranda* warnings were not necessary; and (3) that Defendant's statements were false.  Moreover, the Government asserts that Defendant was not represented by counsel during the May 27, 2005 and June 1, 2005 interviews and the Sixth Amendment does not attach to deportation hearings that are civil in nature.

The Court will review each of Defendant's statements in turn.


### III. DISCUSSION

The Second Circuit addressed similar issues in *United States v. Rodriguez*, 356 F.3d 254 (2d Cir. 2004).  In that case, the defendant was charged with, and later convicted of, illegal

reentry after deportation in violation of 8 U.S.C. § 1326 and of passport and visa fraud in violation of 18 U.S.C. §§ 1543, 1546, respectively.  He appealed his conviction on the ground that the district court had erred in permitting an INS Special Agent to testify about statements that he had made to the agent four years earlier during an interview that took place while he was incarcerated at Rikers Island on unrelated stated charges.  The defendant argued that he did not receive a *Miranda* warning before giving his statement to the INS Special Agent.  The Second Circuit rejected this argument and affirmed the defendant's conviction.

In *Rodriguez*, an INS Special Agent interviewed the defendant pursuant to an INS policy of interviewing inmates whose national origin is listed as unknown or somewhere other than the United States.  The Special Agent testified that the purpose of his interview with the defendant was to determine if he were subject to administrative deportation proceedings.  During the interview, the Special Agent asked the defendant the questions listed on INS Form I-215c, entitled "Affidavit in an Administrative Proceeding."[2]  Before he asked these questions, however, the Special Agent recited an introductory portion of the form, which included the following statements: "You have the right to be represented by counsel of your choice at no expense to the Government" and "Any statement you make may be used against you in a subsequent administrative proceeding."  The defendant refused to sign the form, but the Special Agent signed it with a third party acting as a witness.  As a result of this interview, an INS detainer was lodged against the defendant, indicating that he was subject to administrative deportation upon completion of his sentence and, subsequently, he was deported.

Less than one year after he was deported, the defendant was apprehended at JFK airport

_____

[2] This is the same form as the one that the immigration officers used in this case.

attempting to reenter the United States without the Attorney General's permission by using a false name, passport and visa.  As a result, he was indicted for passport and visa fraud and illegal reentry after deportation.

During the course of his trial, the defendant moved to suppress the Special Agent's testimony regarding the Rikers Island interview during which the defendant had stated that he was a citizen of the Dominican Republic.  After a suppression hearing, the court denied the motion, concluding that *Miranda* warnings were not required for an immigration official's routine administrative interview to determine whether an individual in custody is subject to deportation.  On appeal, the defendant argued that the Special Agent obtained his statements during a custodial interrogation, that he was therefore entitled to a *Miranda* warning, and that, in the absence of such a warning, the trial court should have suppressed the Special Agent's testimony about what the defendant said during the interview.

The Second Circuit began its analysis by discussing its definition of "custodial interrogation," quoting at length from one of its earlier decisions:

> "Custodial interrogation exists when a law enforcement official questions an individual and that questioning was (1) conducted in custodial settings that have inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak, *Miranda*, 384 U.S. at 467, 86 S. Ct. 1602 (the in custody requirement) and (2) when the inquiry is conducted by officers who are aware of the potentially incriminatory nature of the disclosures sought (the investigative intent requirement).  Only questioning that reflects a measure of compulsion above and beyond that inherent in custody itself constitutes interrogation the fruits of which may be received in evidence only after *Miranda* warnings have been given.  The questions asked must have been both likely to elicit an incriminating response and to produce psychological pressures that will subject the individual to the 'will' of his examiner."

-5-

*Rodriguez*, 356 F.3d at 258 (quoting *United States v. Morales*, 834 F.2d 35, 38 (2d Cir. 1987)).

The court noted that the district court had not analyzed the "in custody" prong of the custodial interrogation inquiry because it found that there was no question that the defendant was being interrogated in custody.  However, the Second Circuit stated that "[t]he 'in custody' inquiry . . . is not entirely straightforward – that [the defendant] was incarcerated at the time of the interview may not be sufficient for a finding of custodial interrogation."  *Id.* (citation omitted). The court explained that "[a]rguably, under *Morales*, for the 'in custody' requirement to be met in this case, [the Special Agent's] questions had to have been likely to produce coercive 'psychological pressures' subjecting [the defendant] to the 'will' of his examiner, which they may or may not have been."  *Id.* at 259 (citation omitted).  Nonetheless, "because . . . [the Special Agent's] interview failed the second part of the *Morales* test," *id.*, the court assumed that the defendant was "in custody" when he was incarcerated.

With respect to the second prong of the inquiry – whether the officers conducting the inquiry were aware of the potentially incriminating nature of the disclosures sought – the court noted that the Special Agent testified without contradiction that he conducted his interview of the defendant for the sole purpose of determining whether the defendant would be subject to administrative deportation after his release.  Moreover, the Special Agent testified that he was not aware that the information that he elicited could be the basis for criminal prosecution.

The court noted that the result of the interview was consistent with its purpose – the defendant was deported administratively.  Furthermore, the information disclosed in the interview did not become relevant to a criminal proceeding against the defendant until three years later when he tried to reenter the United States without permission and with a fake passport.  The

court concluded that there was nothing in the record to indicate that the Special Agent knew or should have known that evidence for an eventual prosecution would emerge from his administrative interview of the defendant. Thus, the court concluded that "[t]he district court . . . did not err in finding that [the Special Agent] was unaware of the potentially incriminatory nature of the disclosures he sought from [the defendant]. [Thus,] [n]o *Miranda* warning was required." *Rodriguez*, 356 F.3d at 259 (internal footnote omitted).[3]

The court completed its analysis by rejecting the defendant's substantial reliance on *Mathis v. United States*, 391 U.S. 1 (1968), upon which Defendant also relies. In *Mathis*, the Supreme Court reversed a conviction for tax fraud because an incriminating statement that an IRS agent had obtained while defendant was incarcerated in state prison on other charges had not been preceded by *Miranda* warnings. The Second Circuit noted that

> the IRS's investigatory interrogation in *Mathis* was dissimilar from the INS's administrative inquiry here. There, an IRS investigation (albeit a "routine" one) of the defendant with respect to specific, questionable tax returns he had filed with the IRS was underway at the time of the interview. It is clear from the Court's recitation of the facts of the case that the purpose of the investigation under consideration was, *inter alia*, to obtain evidence in connection with a possible subsequent civil or criminal prosecution, criminal prosecution of the defendant being a likely outcome. . . . The interview was thus in marked contrast to the questioning of [the defendant] by [the Special Agent] in the case before us, where

---

[3] The court noted that its conclusion was consistent with the Ninth Circuit's decision in *United States v. Salgado*, 292 F.3d 1169 (9th Cir. 2002), in which an INS agent interviewed the defendant, while he was incarcerated on a state weapons charge, to determine whether he was subject to deportation. At the time of the interview, the defendant had not committed an offense to which his citizenship or nationality would be relevant, and the INS agent had no reason to think that the defendant's statements would later incriminate him. Finding that "'the questioner [could not] have reasonably suspected that the question was likely to elicit an incriminating response,'" . . . the Ninth Circuit concluded that the INS interview was not an "interrogation" for purposes of *Miranda*. *Rodriguez*, 365 F.3d at 260 (quotation omitted).

> there is no basis in the record to conclude that [the Special Agent] knew or should have known that the results of his interview would be used to support criminal charges resulting from conduct of [the defendant] – conduct that would not take place until three years thereafter.  Thus, in *Mathis*, the government was clearly "aware [at the time of the interrogation] of the potentially incriminating nature of the disclosures sought," *Morales*, 834 F.2d at 38; in the case before us, the government was not.  We therefore conclude that *Mathis* does not require a reversal here.

*Rodriguez*, 356 F.3d at 260 (internal citation omitted).

### 1. Defendant's May 27, 2005 interview

With regard to the May 27, 2005 interview, there is nothing in the record to indicate that, at the time of that interview, Deportation Officer Peter Mortensen knew or should have known that the results of his interview would be used to support criminal charges against Defendant.  Mr. Mortensen's uncontroverted testimony was that he conducted this interview to determine Defendant's alienage and deportability and to find out if the INS needed to charge Defendant with notice to appear at an immigration proceeding.  *See* Dkt. No. 18, Transcript of Suppression Hearing ("Tr."), at 14-15.  Based upon this testimony, the Court concludes that Mr. Mortensen was not aware – at the time that he interviewed Defendant – of the potential incriminating nature of the disclosures that he sought.  Thus, he was not required to provide Defendant with *Miranda* warnings prior to his interview.  Accordingly, the Court denies Defendant's motion to suppress his May 27, 2005 statements.

### 2. Defendant's June 1, 2005 interview

Defendant's June 1, 2005 interview, however, stands on a different footing.  The

uncontroverted evidence adduced at the suppression hearing establishes that SA Polouski received Defendant's file from Mr. Mortensen because Mr. Mortensen was suspicious of Defendant's statement that he was born in Brooklyn, New York.  After receiving that file, SA Polouski reviewed the file and further investigated the issue, at which point he discovered that Defendant had entered the United States as a B-2 nonimmigrant visitor and was a citizen of Trinidad and Tobago.  *See* Tr. at 54.  Armed with this information, he decided to interview Defendant for a second time on June 1, 2005.  Under these circumstances, the Court has no doubt that, at the time of that interview, SA Polouski knew or should have known that, if Defendant continued to claim that he was a United States citizen, his statement could be used to support criminal charges against him.  Accordingly, the Court grants Defendant's motion to suppress his June 1, 2005 statements.[4]

### IV. CONCLUSION

Based upon the evidence adduced at the suppression hearing and the applicable law and for the reasons stated herein, the Court hereby

**ORDERS** that Defendant's motion to suppress the statements that he made to immigration officers during his May 27, 2005 interview is **DENIED**; and the Court further

**ORDERS** that Defendant's motion to suppress the statements that he made to immigration officers during his June 1, 2005 interview is **GRANTED**; and the Court further

**ORDERS** that Defendant's motion to suppress the statements that he made to

---

[4] There is no dispute that SA Polouski did not provide Defendant with a *Miranda* warning prior to questioning him on June 1, 2005.

immigration officers during his December 15, 2005 interview is **DENIED AS MOOT** based upon the Government's statement to the Court that it does not intend to use these statements as evidence in its case-in-chief; and the Court further

ORDERS that the Government shall initiate a telephone conference with the Court and opposing counsel, using a professional telephone conferencing service, on **November 22, 2006**, at **9:30 a.m.** to set a trial date for this matter.

**IT IS SO ORDERED.**

Dated: November 15, 2006
        Syracuse, New York

_____
Frederick J. Scullin, Jr.
Senior United States District Court Judge

-10-